|  |  |  |
|---|---|---|
| AFFORDABLE COMMUNITIES OF MISSOURI, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:11-CV-555 CAS |
| EF&A CAPITAL CORP., et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Federal National Mortgage Association's ("Fannie Mae") Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6), Federal Rules of Civil Procedure. Plaintiff Affordable Communities of Missouri ("ACM") opposes the motion and it is fully briefed. For the following reasons, the motion to dismiss will be granted.

**Background**

ACM is a limited partnership that at one time owned the Jefferson Arms Apartments ("the "Property") in St. Louis, Missouri. In 1999, ACM sought to refinance the existing secured debt on the Property. For assistance with the refinancing, ACM's principal, Barry Cohen, contacted defendant Eichler, Fayne & Associates ("EFA"),[1] a lender in the business of making loans secured by mortgages on multifamily properties. EFA operated under defendant Fannie Mae's Delegated Underwriting and Servicing ("DUS") program, under which Fannie Mae purchases loans originated by EFA and serviced by EFA, with EFA and Fannie Mae sharing the risk of loss on the loans.

---

[1]All references to EFA include its general partner, defendant EF&A Capital Corp., and its successor, defendant EF&A Funding, LLC.

Loans issued under the DUS program include certain rules and requirements imposed by Fannie Mae for loans that will be sold to it and in the secondary market.[2]

ACM communicated with EFA's representative Gene Glaser, who ACM asserts was also acting on behalf of Fannie Mae. ACM states that Glaser told Cohen the DUS program included limitations on loan prepayments that required borrowers to choose between two forms of prepayment options--a yield maintenance option, or a defeasance option that involved substitution of collateral instead of a loan prepayment fee. ACM alleges that Glaser stated the defeasance option should cost a borrower less than the yield maintenance option. ACM asserts that this representation was false because of Glaser and EFA's failure to use ordinary care in obtaining or communicating accurate information, that ACM did not know the representation was false, and that ACM relied on the representation.

ACM chose the defeasance option and not the yield maintenance option for its loan because, based on Glaser's representations, it believed that upon any necessary defeasance under the loan, the substitute collateral would be new securities at the then-prevailing mortgage rates for similar properties that were available for purchase in the marketplace at the time, which matched the credit rating in terms of the original mortgage/deed of trust placed upon the Property in connection with the loan made by EFA.[3] ACM closed on the transaction with EFA and obtained a loan for

---

[2]Fannie Mae is a government-sponsored but privately-owned enterprise chartered by Congress, 12 U.S.C. § 1216. Fannie Mae is prohibited from originating mortgage loans, 12 U.S.C. § 1719(a)(2), but rather operates in the U.S. secondary mortgage market.

[3]Inclusion of a prepayment fee is a common component of commercial loan transactions. Prepayment fees are charged because a "lender who makes a long-term loan expecting a particular rate of return runs the risk that prepayment during a period of lower interest rates will reduce its income." River East Plaza, L.L.C. v. Variable Annuity Life Ins. Co., 498 F.3d 718, 721 (7th Cir. 2007).

$8,175,000 (the "Loan"), which was evidenced by certain loan documents (the "Loan Documents"), including a Multifamily Note dated April 22, 1999 with attached Schedules A, B and C (the "Note"), and a Multifamily Open-End Deed of Trust, Assignment of Rents, and Security Agreement dated April 22, 1999 with attached Exhibits A, B and C (the "Security Instrument"). Subsequently, the Loan was sold and assigned to Fannie Mae in the secondary mortgage market.

In 2005, approximately six years after the Loan was made, the City of St. Louis ("City") threatened the use of eminent domain as a means of acquiring the Property from ACM through condemnation. ACM alleges the City worked with another real estate developer in an effort to arrange a conveyance of the Property by ACM to the other developer in lieu of condemnation proceedings. ACM then entered into a Purchase and Sale Agreement with the other real estate developer, which specifically stated that ACM agreed to sell the Property in lieu of the threatened condemnation. In connection with the sale transaction, ACM contacted EFA and informed it that the sale of the Property pursuant to the Purchase and Sale Agreement was in lieu of condemnation, but under threat of condemnation, and that the intended sale of the Property would not violate the prepayment prohibitions of the Loan Documents under Schedule B to the Note, notwithstanding the defeasance provisions in Schedule B and in the Security Instrument.

---

"Under a yield maintenance formula, the borrower discharges the debt with a onetime fee sufficient to enable the lender, reinvesting at current rates, to earn no less than it would have earned had the borrower not prepaid." Lefcoe, George, Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment, Real Est. L. J. 202, 203 (Winter 2000). In this case, the yield maintenance option required, upon prepayment, the payment of all principal and interest under the loan plus a premium equal to 1% of the unpaid loan balance. "By contrast, defeasance effects no early termination of the debt. Instead, the borrower is allowed to substitute for the mortgage a carefully assembled package of noncallable and non-prepayable U.S. government obligations." Id.

EFA and Fannie Mae disagreed that the prepayment prohibitions were not violated, and required ACM to proceed under the defeasance option of Exhibit B to the Security Instrument and to comply with all of the provisions in the Loan Documents relating to defeasance if ACM wanted to sell the Property and obtain the release of the lien on the Property under the Security Instrument. EFA, representing Fannie Mae, provided ACM an estimated amount of a prepayment fee which was calculated as the Defeasance Deposit under the terms of the Note and the Security Instrument. ACM was required to give a defeasance notice and pay a defeasance commitment fee within the time frame called for by the Loan Documents in order to effectuate a substitution of collateral for the mortgaged Property and obtain the release of the lien on the Property provided under the Loan Documents, in order to allow a sale of the Property otherwise constituting the collateral for the Loan.

ACM completed the defeasance process in order to sell the Property, thereby substituting collateral which was purchased with ACM funds through the defeasance process. The substitute collateral was a Fannie Mae Investment Security with a rate of 4.8524%, determined based on the then-current yields on highly rated U.S. Treasury Securities. ACM alleges that since the rate of these securities was substantially below the 7.065% rate called for under the original Note, Security Instrument and Loan Documents encumbering the Property and the payments on the Note had to be satisfied out of the Fannie Mae Investment Security, ACM was required to pay a substantial amount over the Note balance in order to purchase the securities constituting the substitute collateral in order to obtain the release of the lien on the Property to allow the sale to proceed.

The scheduled amount ACM owed under the Loan held by Fannie Mae was approximately $7,100,000. To obtain the release of the lien on the Property so that ACM could sell it, ACM alleges it paid a defeasance commitment fee to EFA and Fannie Mae of 1% of that loan balance. ACM also alleges it paid the Defeasance Deposit calculated by EFA and Fannie Mae in connection with the

closing and release of the mortgage lien on the Property. ACM alleges it should not have had to pay these prepayment fees and that it suffered damages as a direct result of the defendants' actions in the amount of approximately $500,000.

ACM filed its Petition in state court asserting claims against EFA and Fannie Mae for negligent misrepresentation (Count I), breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and unjust enrichment (Count IV). The case was removed to this Court. Fannie Mae moves to dismiss each count for failure to state a claim upon which relief can be granted.

**Legal Standard**

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A plaintiff need not provide specific facts in support of its allegations, Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam), but "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir.), cert. denied, 129 S. Ct. 222 (2008) (citing Twombly, 550 U.S. at 555 & n.3). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." Id. at 562 (quoted case omitted).

This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." Id. at 556.

The Eighth Circuit has instructed, "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice." Hamilton v. Palm, 621 F;3d 816, 817-18 (8th Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1949). "Determining whether a claim is plausible is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 818 (quoting Iqbal, 129 S. Ct. at 1950).

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," id. at 556, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. Twombly, 550 U.S. at 555-56; Fed. R. Civ. P. 8(a)(2). Materials attached to the complaint as exhibits may be considered in construing the sufficiency of the complaint. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).[4]

**Discussion**

A. Negligent Misrepresentation – Count I

Fannie Mae moves to dismiss Count I, which asserts a claim for negligent misrepresentation, on the basis that ACM has failed to plead sufficient facts establishing an agency relationship between Fannie Mae and EFA. The parties agree that Missouri law controls this matter.

"Missouri applies a clear three-part test for determining whether a party is an agent of another. First, the principal must have the right to control the conduct of the agent with respect to

---

[4]The Loan Documents at issue in this case are attached as exhibits to the Petition.

matters entrusted to the agent. Second, an agent must be a fiduciary of the principal. Third, the agent must be able to alter legal relationships between the principal and a third party." State ex rel. McDonald's Corp. v. Midkiff, 226 S.W.3d 119, 123 (Mo. 2007) (en banc) (internal citations omitted). "The absence of any one of these three elements defeats a claim that agency exists." Id. (quoting State ex rel. Bunting v. Koehr, 865 S.W.2d 351, 353 (Mo. 1993) (en banc)).

Under Missouri law, a principal-agent relationship "arises out of contract, express or implied. It is an agreement whereby one person, the agent, consents with another, the principal, to act on behalf of the principal subject to the control of the principal." World Resources, Ltd. v. Utterback, 943 S.W.2d 269, 270 (Mo. Ct. App. 1997) (cited case omitted). The party that alleges an agency relationship bears the burden to establish its existence. Elam v. Dawson, 216 S.W.3d 251, 254 (Mo. Ct. App. 2007).

Fannie Mae argues that ACM's Petition offers nothing more than sparse and conclusory allegations regarding an agency relationship between Fannie Mae and EFA, for example, that "EFA was part of the network of Fannie Mae Lender Partners and EFA acted as an agent of Fannie Mae." Petition, ¶ 3. The Petition also alleges that

> EFA operated under the Delegated Underwriting and Servicing ("DUS") program of Fannie Mae, which includes certain rules and requirements imposed by Fannie Mae for loans that will be sold to Fannie Mae in the secondary market. Under the DUS program, Fannie Mae purchases loans originated from EFA and serviced by EFA, with EFA and Fannie Mae sharing the risk of loss on the loans.

Petition, ¶10. Fannie Mae argues that nowhere in the Petition does ACM allege facts or assertions to establish that by being a part of the network or by participating in Fannie Mae's DUS Program that: (1) EFA had the power to establish or alter legal relationships between Fannie Mae and ACM and between Fannie Mae and EFA, (2) a fiduciary relationship existed between Fannie Mae and

EFA with respect to matters within the scope of the alleged agency, and (3) Fannie Mae had the right to control the conduct of EFA.

Fannie Mae also asserts that ACM has pled no facts from which the Court can infer that Fannie Mae authorized EFA to make the alleged statements about the costs of and/or the effect of the Loan Documents, specifically, the effect of the defeasance option in Schedule B of the Note, see Petition, ¶¶ 16, 17, or that Fannie Mae had any knowledge, actual or otherwise, of EFA's alleged statements about the effect of the Loan Documents. See Petition, ¶ 19.

ACM responds that the Petition's allegations satisfy Missouri law concerning the three elements of agency. Specifically, ACM alleges that Fannie Mae had the right to control EFA through: (1) the terms of the DUS program; (2) the description of the costs and benefits of the components of the DUS program; (3) Fannie Mae's direct administration of the DUS program through EFA; (4) complete control of the terms of the Loan documents; (5) Fannie Mae's control over the refusal to honor the applicable condemnation provisions of the Security Agreement; (6) directing how the costs associated with the Fannie Mae defeasance process would be charged in the event of a condemnation threat; (7) Fannie Mae's control of communications through EFA; and (8) EFA's role as loan servicer for Fannie Mae.

ACM also asserts that the Petition alleges facts indicating EFA acted as a fiduciary to Fannie Mae in relation to the Loan, and that under Missouri law a fiduciary is defined as "one who acts primarily for the benefit of the principal." State ex re. Domino's Pizza, Inc. v. Dowd, 941 S.W.2d 663, 666 (Mo. Ct. App. 1997). ACM asserts that the petition is "replete with factual allegations that EFA acted for the benefit of Fannie Mae," including that Fannie Mae holds out EFA as a partner and directs potential loan applicants to EFA for purposes of obtaining Fannie Mae loans; and that EFA used only loan documents provided by Fannie Mae, took instruction from Fannie Mae on loan terms,

and could not shop the loans on the secondary market. ACM also states that it alleges Fannie Mae accepted the benefits of EFA's efforts, as it collected the Rate Lock Deposit, collected the Defeasance Deposit, and collected interest and fees on the Loan, all accomplished through EFA as Loan servicer.

ACM also asserts that EFA had the authority to alter relationships between Fannie Mae and third parties, as shown by the petition's allegations that Fannie Mae addressed and administered the Loan only through EFA, EFA acted as the Loan servicer, and any alterations to the Loan or Fannie Mae's chosen means of enforcing the Loan, were also performed through EFA. ACM therefore contends that EFA had actual authority to convey loan applications leading to binding relations between Fannie Mae and third parties.

The Petition's factual allegations show clearly that Fannie Mae was not a party to the Loan transaction until after ACM had already allegedly relied on the claimed misrepresentations by EFA and Mr. Glaser. None of the eight factors listed above on which ACM bases its contention that Fannie Mae had the right to control EFA are sufficient to establish a factual link to Fannie Mae as being the speaker of the alleged misrepresentations. In fact, factors five through eight describe matters that necessarily occurred after the alleged misrepresentations had been made and Fannie Mae purchased the Loan.

The Petition also does not allege any facts to demonstrate EFA's power to alter the legal relationships between Fannie Mae and ACM. This is because there was no legal relationship between ACM and Fannie Mae at all until Fannie Mae purchased the ACM Loan. By that time, ACM had already relied on the alleged misrepresentations and entered into the Loan with EFA, not with Fannie Mae. Therefore, under the facts alleged, Fannie Mae was not a speaker of the negligent misrepresentations and could not be such a speaker, as a matter of law.

In additional, no allegations in the Petition or in ACM's list of eight control factors support the existence of a fiduciary relationship between Fannie Mae and EFA at any time prior to the Loan purchase and EFA becoming the Loan servicer. Again, ACM had already relied on any misrepresentations and had closed the Loan by the time any fiduciary relationship could legally have arisen between Fannie Mae and EFA.

Finally, there are no facts pleaded that demonstrate any right by Fannie Mae to control the conduct of EFA before Fannie Mae purchased the Loan. While Fannie Mae mandated the form of the loan documents on loans it would purchase from various lenders, that fact does not tend to establish that Fannie Mae could control EFA's conduct before Fannie Mae purchased the Loan. A similar agency argument was rejected in a case concerning Freddie Mac, another federally-chartered stockholder-owned purchaser of mortgages on the secondary market that also requires the loans it purchases to meet its standards and specifications:

> The fact that Freddie Mac bought all qualifying loans submitted to it by [lender] by computer transmission pursuant to the [Freddie Mac] Master Commitment does not establish that Freddie Mac controlled [the lender]; it merely indicates that Freddie Mac is a very large business whose viability depends upon the acceptance of a large volume of qualifying loans in an expedient manner. . . . A requirement that work performed according to standards and specifications imposed by an employer under a contract is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the employer. See 41 Am.Jur.2d Independent Contractors § 8 (1968). Indeed, if the court were to find that the Master Commitment and Guide created an agency relationship between [the lender] and Freddie Mac, the import of such a decision would be that all entities that sell mortgages to Freddie Mac under similar circumstances would be agents of Freddie Mac, a result with far-reaching implications. The court simply does not believe that the law or facts of this case lead to such a finding.

In re Ellis, 152 B.R. 211, 218 (Bankr. E.D. Tenn. 1993). These principles and considerations also apply here.

In this case, the Petition's allegations that EFA acted as Fannie Mae's agent prior to Fannie Mae's purchase of the Loan Documents, such that representations by EFA may be attributed to Fannie Mae, are mere legal conclusions which are not supported by facts as to any of the three elements of an agency relationship under Missouri law. The pleading of a legal conclusion is insufficient to survive a motion to dismiss. See Twombly, 127 S. Ct. at 1965. Fannie Mae's motion to dismiss Count I should therefore be granted. As a result, the Court does not address Fannie Mae's other arguments in support of the dismissal of Count I.

B. Breach of Contract – Count II

Fannie Mae moves to dismiss Count II, which asserts a claim for breach of contract. In Count II, ACM asserts that under the terms of the Loan Documents, it should have been allowed to prepay the remaining Loan balance without any cost or penalty upon its conveyance of the Property in lieu of condemnation, but EFA & Fannie Mae wrongly required it to comply with defeasance provisions in the Security Instrument requiring payment of a defeasance commitment fee and Defeasance Deposit.

Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. 2010) (en banc). Fannie Mae argues that ACM does not state a claim for breach of contract because it does not plead facts that plausibly show the third or fourth elements of the cause of action.

Fannie Mae states that in Count II, ACM alleges that because it was under threat of condemnation when it sold the Property, it was not required to pay the prepayment premium under the terms of the Loan Documents. ACM alleges that "[f]aced with the *threat* of condemnation,

ACM entered into a Purchase and Sale Agreement with another real estate developer in the fall of 2005, which specifically recited the *threat* of condemnation by the City of St. Louis, and provided that ACM agreed to sell the Jefferson Arms in lieu of such condemnation."  Petition, ¶ 43 (italics added).

Fannie Mae argues that the clear and unambiguous terms of the Loan Documents specifically establish that a condemnation award, not the threat of condemnation, is required in order for ACM to avoid the prepayment premium.  Fannie Mae cites the following language of the Note:

> Notwithstanding Paragraph 10 of this Note, Borrower shall not have the right voluntarily to prepay any of the principal of this Note during the period beginning on the date of this Note and ending on the 90th day before the Maturity Date (determined without regard to Lender's exercise of any right of acceleration of this Note) (the "Lockout period").  The preceding sentence shall not apply to a prepayment occurring as a result of the application of any insurance proceeds or **condemnation award** under the Security Instrument.

Petition, Ex. 2, Schedule B, ¶ 2, p. B-1 (emphasis added).  Fannie Mae argues that the Property was only under the threat of condemnation, and a threat of condemnation does not equal a condemnation award, as several steps would have to occur between the threat of condemnation and the issuance of an actual award of condemnation.  Fannie Mae contends that under the plain language of the Loan Documents, a threat of condemnation is not the equivalent of an award of condemnation, and therefore Count II does not state a plausible claim and must be dismissed under Iqbal. [Plaintiff cannot rewrite the unambiguous terms of the Loan Documents for purposes of its claims herein.]

ACM responds that Fannie Mae's argument ignores the language of the governing contracts, specifically the relevant provision of the Security Instrument dealing with condemnation, which is explicitly referenced in the Note language quoted above.  ACM states that while the Note provides the borrower may not voluntarily prepay the note except by the application of a "condemnation award under the Security Instrument," Paragraph 20 of the Security Instrument expressly defines

a condemnation as "a condemnation or other taking, <u>or a conveyance in lieu thereof</u>, of all or any part of the Mortgaged Property, <u>whether direct or indirect</u> (a "Condemnation")." (Emphasis added).

ACM states that the Petition alleges the sale of the Property was a conveyance in lieu of a condemnation, made under a direct threat of condemnation. Pet. ¶ 42. ACM argues that a "condemnation award under the Security Instrument" as referenced in the Note clearly incorporates conveyances "in lieu of condemnation." ACM contends there is no alternative definition offered in the Note on which Fannie Mae can rely, but rather the Note refers expressly to the Security Instrument and the condemnation definition in paragraph 20 thereof. ACM states that none of the documents contain an alternative definition, and the definition in the paragraph 20 of Security Instrument is "crystal clear" that an award is not required. ACM contends that its interpretation of the Note and Security Instrument harmonizes the plain language of all relevant provisions.

Fannie Mae replies that ACM's Petition and opposition memorandum ignore the controlling language that describes the only event pursuant to which ACM could prepay the principal of the Note without penalty: "prepayment occurring as a result of the application of any … condemnation award under the Security Instrument." Note, Schedule B, ¶ 2. Fannie Mae argues the only possible interpretation of the phrase "application of any … condemnation award" is to mean prepayment of the Note from an award stemming from a formal condemnation proceeding. Fannie Mae argues that based on unambiguous language in the Note and Security Agreement, ACM had no right to prepay the Loan at the time it sold the Property under threat of condemnation. Fannie Mae states that the Petition does not allege ACM prepaid the Note out of a "condemnation award," and without such an allegation it has not pleaded an actionable claim for breach of contract as a matter of law.

Fannie Mae states that ACM's argument, that payment of the Note in a sale of the Property under threat of condemnation is the same thing as payment from a condemnation award, is precluded

by the express language of the Note and the Security Instrument, and does not reflect the parties' agreement. As set forth above, ACM contends that the definition of the capitalized term "Condemnation" in Section 20 of the Security Instrument controls interpretation of the phrase "condemnation award" in Schedule B, ¶ 2 and Section 10(b) of the Note. Fannie Mae argues that Section 20 of the Security Instrument does not contain any language giving ACM a right to prepay based on a sale in lieu of or under threat of condemnation, and that Section 20 does not even address or apply to prepayment of the Note.

Paragraph 1 of Schedule B of the Note provides, "All capitalized terms used but not defined in the Note (including this Schedule B), shall have the meanings given to such terms in the Security Instrument (as that term is defined in this Note). Based on this provision, Fannie Mae asserts that use of the lower-case phrase "condemnation award" in Section 10 and Schedule B, ¶ 2 of the Note, must be read to mean that the parties did not intend the meaning of the defined and capitalized term "Condemnation," from Section 20 of the Security Instrument, to be applicable to the "condemnation award" phrase in the Note. Fannie Mae observes that the defined term "Condemnation" was not used in the Note, although pursuant to Schedule B, ¶ 1, the parties could have used the defined term if they had intended the broader meaning of the defined term "Condemnation" from the Security Instrument to apply to the phrase "condemnation award" in the Note. Fannie Mae concludes that because the parties intentionally did not use the phrase "Condemnation award" in the Note's prepayment language, which would have incorporated the defined term "Condemnation" from the Security Instrument and given the phrase a broader meaning, a narrower meaning was intended for "condemnation award," such that ACM was required to pay prepayment fees when it sold the Property under threat of condemnation.

Fannie Mae argues the phrase "condemnation award" must be interpreted by its plain meaning, i.e., a formal award of compensation following condemnation proceedings under state law. Fannie Mae notes that Sections 20(a) and (b) of the Security Instrument distinguish between a condemnation "award" and a "payment."  Fannie Mae argues that this language supports its interpretation that in the event of a formal condemnation action or proceeding, the use of the word "award" is applicable, and in the event of a conveyance under threat of or in lieu of condemnation, the use of the word "payment" is applicable.  Fannie Mae also argues that its interpretation of the phrase "condemnation award" is supported by Chapter 523, Missouri Revised Statutes, as the statutory sections therein use the phrase "condemnation award" to mean the amount of the damages assessed by the commissioners appointed in a formal condemnation lawsuit commenced by filing a petition and issuing a summons. Fannie Mae argues that a "condemnation award" cannot arise from the mere threat of condemnation or from a conveyance in lieu thereof, and that ACM's argument seeks to rewrite the terms of the Loan Documents.

The Missouri Supreme Court has stated the following general rules concerning the respective roles of the jury and the court in the construction of contracts:

> Where the language of the contract on its face is not clear or is ambiguous, and resort to extrinsic evidence is necessary, if such evidence be conflicting, or, if not conflicting, different conclusions might reasonably be drawn therefrom, the construction of the agreement is for the jury under proper instructions from the Court. But where a contract is clear and unambiguous on its face, or where there is no real conflict of evidence upon any of the essential facts properly to be considered in construing the contract, and the true meaning of the words used is made clear by such evidence, it becomes the duty of the Court, and not the jury, to construe it.

Commerce Trust Company v. Howard, 429 S.W.2d 702, 705-06 (Mo. 1968) (quoted case omitted).

Whether a contract is ambiguous or not is a question of law for the court.  Busch & Latta Painting Corp. v. State Highway Comm'n, 597 S.W.2d 189, 197 (Mo. Ct. App. 1980) (cited cases omitted).

The Court finds, as a matter of law, that the Loan Documents in this case are unambiguous. Under the relevant language of Schedule B, ¶ 2 of the Note--"prepayment occurring as a result of the application of any … condemnation award under the Security Instrument"--ACM was entitled to prepay the Loan without penalty only if it paid off the Loan with the proceeds of a formal condemnation award for the Property.

This is because the phrase "condemnation award" used in Schedule B of the Note is significantly narrower than the defined term "Condemnation" used in Paragraph 20 of the Security Instrument. The Note states that any capitalized terms used but not defined in the Note, including Schedule B, shall have the same meanings given to those terms in the Security Instrument. The parties chose not to include the capitalized, defined term "Condemnation" in the Note. As a result, the definition of "Condemnation" in the Security Instrument does not apply to the Note or Schedule B thereof. The plain meaning of the phrase "condemnation award" used in Schedule B of the Note refers to a formal condemnation award, in this case, under the applicable Missouri statutes and procedures. As a result, for ACM to be entitled to prepay the Loan without penalty, it had to receive a formal condemnation award and then apply the proceeds of that award to the Loan. The factual allegations of the Petition are that ACM did not receive a formal condemnation award, but rather chose to sell the Property in lieu of or under the threat of a formal condemnation.

Because the unambiguous language of the Note and Security Instrument establishes that ACM had no right to prepay the Loan at the time of its sale of the Property in lieu of or under threat of condemnation, Fannie Mae's enforcement of its contractual right to receive the defeasance commitment fee and Defeasance Deposit upon ACM's sale of the Property did not constitute a breach of the Note or Security Instrument, as a matter of law. Fannie Mae's motion to dismiss Count II should therefore be granted.

C.  Breach of the Covenant of Good Faith and Fair Dealing – Count III

Fannie Mae moves to dismiss Count III, which asserts a claim for breach of the implied covenant of good faith and fair dealing.  Fannie Mae argues that this claim is not actionable because the actions it took in requiring ACM to pay the defeasance fees were expressly permitted by the Loan Documents, and it acted in accordance with the terms of the Loan Documents.  Fannie Mae also notes that the Petition does not specifically allege how Fannie Mae breached this implied covenant.

Under Missouri law, "There is a promise implied in every contract not to prevent or hinder performance by the other party and a breach of this implied promise constitutes a breach of contract."  Housley v. Mericle, 57 S.W.3d 360, 363 (Mo. Ct. App. 2001) (citations omitted).  A claim for breach of the implied covenant of good faith and fair dealing is a contractual claim.  Hardee's Food Sys., Inc. v. Hallbeck, __ F.Supp.2d __, 2011 WL 830549, at *4 (E.D. Mo. Mar. 3, 2011) (citing Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 413 (Mo. Ct. App. 2000)).  "In order to succeed on a breach of contract, a plaintiff must show the making of a valid enforceable contract between the plaintiff and defendant, the right of the plaintiff and obligation of the defendant under the contract, a violation by the defendant, and damages resulting to the plaintiff from the breach."  Koger, 28 S.W.3d at 412 (cited case omitted).  "The party claiming breach of the implied covenant of good faith must present substantial evidence that it has been violated."  Schell v. LifeMark Hosps. of Missouri, 92 S.W.3d 222, 230 (Mo. App. 2002).

The duty of good faith and fair dealing "prevents one party to the contract from exercising a judgment conferred by the express terms of [the] agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract."  Stone Motor Co. v. Gen. Motors Corp., 293 F.3d 456, 467 (8th Cir. 2002) (citing Amecks, Inc. v. Southwestern.

Bell Tel. Co., 937 S.W.2d 240, 243 (Mo. Ct. App. 1996)). "[T]he implied duty of one party to cooperate with the other party to a contract to enable performance and achievement of expected benefits is an enforceable right.'" Id. (quoting Koger, 28 S.W.3d at 412).

ACM responds that Fannie Mae violated the covenant of good faith and fair dealing when it engaged in opportunistic behavior and exploited changing economic conditions to ensure that it "realized gains in excess of those to which it was entitled," when it: (1) incorrectly represented through EFA the benefits and operations of the defeasance option under the Loan; demanded $165,000 to lock an interest rate, which would be forfeited if ACM did not close the Loan; and only then presented ACM with take-it-or-leave-it loan terms, thus opportunistically compelling ACM to enter into a loan transaction that was at variance with what it had been promised; and (2) refused to release its lien on the Property without first receiving prepayment/defeasance fees and costs, despite the exception to prepayment fees in the Loan Documents for a conveyance in lieu of forfeiture.

Fannie Mae replies that no claim for breach of the covenant of good faith and fair dealing can be pleaded where, as here, the contract expressly permits the actions being challenged and the defendant acts in accordance with the express terms of the contract. Fannie Mae asserts that under Missouri law, the duty of good faith and fair dealing cannot block the application of or change the meaning of terms that actually appear in the contract. Fannie Mae argues that ACM wants to ignore and revise the meaning of the unambiguous language of the Note and Security Instrument regarding when it has a right to prepay, but the assertion of a breach of an implied covenant of good faith and fair dealing cannot override the provisions of Paragraph 10 and Schedule B of the Note concerning prepayment. Fannie Mae asserts that ACM is attempting to use the covenant of good faith and fair dealing to change the parties' contract terms concerning defeasance, but the implied covenant cannot

be used in such a way, as a matter of law. Fannie Mae states that by signing the Note, ACM both agreed to and recognized the reason for the prepayment fees.[5]

The implied duty of good faith and fair dealing is "incapable of altering the express terms of [an] agreement" and "cannot give rise to new obligations not otherwise contained in a contract's express terms." Stone Motor, 293 F.3d at 466 (internal quotation marks and quoted case omitted; applying Missouri law). The Eighth Circuit has described the implied duty as serving "merely as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting." Id. (quoted case omitted). "Since good faith is merely a way of effectuating the parties['] intent in unforeseen circumstances, the implied covenant has nothing to do with the enforcement of terms actually negotiated and cannot block [the] use of terms that actually appear in the contract." Id. (quoted case omitted).

> The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms. Glass

---

[5]Paragraphs 10(e) and (f) of the Note state:

(e)    Borrower recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth on Schedule A represents a reasonable estimate of the damages Lender will incur because of a prepayment.

(f)    Borrower further acknowledges that the prepayment premium provisions of this Note are a material part of the consideration for the loan evidenced by this Note, and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the prepayment premium provisions.

v. Mancuso, 444 S.W.2d 467, 478 (Mo. 1969). The implied covenant simply prohibits one party from "depriv[ing] the other party of its expected benefits under the contract." Morton v. Hearst Corp., 779 S.W.2d 268, 273 (Mo. Ct. App. 1989).

Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996).

Missouri courts have explained that "[i]mplied covenants arise when there is a satisfactory basis in the express contract that makes it necessary to imply certain duties and obligations in order to effectuate the purposes of the parties." Giessow Rests., Inc. v. Richmond Rests., Inc., 232 S.W.3d 576, 579 (Mo. Ct. App. 2007). "A court will not 'find an implied covenant if the parties have either dealt expressly with the matter or have intentionally left the contract silent on the point.'" Id. (quoting Crestwood Plaza, Inc. v. Kroger, 520 S.W.2d 93, 97 (Mo. Ct. App. 1974)). "[T]he implied covenant cannot be used to contradict or override the express . . . terms contained in a contract[.]" Bishop v. Shelter Mut. Ins. Co., 129 S.W.3d 500, 506 (Mo. Ct. App. 2004).

The Court has determined as a matter of law that Fannie Mae cannot be held liable for representations made by EFA before Fannie Mae purchased the Loan, as ACM has not pleaded facts sufficient to establish that EFA was Fannie Mae's agent prior to its purchase of the Loan. As a result, ACM has not pleaded sufficient facts to establish that Fannie Mae could have breached the implied covenant of good faith and fair dealing based on any conduct of or representations by EFA made prior to Fannie Mae's purchase of the Loan. ACM's first argument in support of its claim for breach of the covenant of good faith and fair dealing is therefore without merit.

With respect to ACM's second argument, the Loan Documents in this case expressly permit Fannie Mae to collect under the defeasance option upon sale of the Property, except where ACM paid off the Loan with the proceeds of a condemnation award. As a result, ACM cannot establish its entitlement to prepay the Loan without a fee based on the implied duty of good faith and fair dealing. Here, Fannie Mae merely enforced the terms of the Loan Documents and did nothing that

prevented or hindered ACM in the performance of the contract, evaded the spirit of the transaction, or deprived ACM of its expected contractual benefits. Certainly, ACM would have preferred not to have to pay a substantial fee upon prepaying the Loan following sale of the Property in lieu of foreclosure, but this is exactly what the Loan Documents specified. ACM has not alleged any facts to demonstrate that it was denied the expected benefits of the Loan transaction when Fannie Mae required it to pay the defeasance fees. As a result, ACM cannot assert a claim for breach of the duty of good faith and fair dealing as a matter of law. Fannie Mae's motion to dismiss Count III should be granted.

> D. Unjust Enrichment – Count IV

Finally, Fannie Mae moves to dismiss Count IV, which asserts a claim for unjust enrichment. Fannie Mae argues that ACM fails to plead facts to establish that Fannie Mae was unjustly enriched when it enforced the terms of the Loan Documents as written.

Under Missouri law, "An unjust enrichment has occurred where a benefit was conferred upon a person in circumstances in which retention of the benefit, without paying its reasonable value, would be unjust." S & J, Inc. v. McLoud & Co., L.L.C., 108 S.W.3d 765, 768 (Mo. Ct. App. 2003). The elements of unjust enrichment are (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of that benefit; and (3) acceptance and retention of the benefit under such circumstances that it would be inequitable for defendant to retain the benefit without paying for its value. US Bank Nat'l Ass'n v. Cox, 314 S.W.3d 846, 852 (Mo. Ct. App. 2011) (cited cases omitted).

Fannie Mae states that under the Loan Documents, in order to avoid the prepayment premium obligation, ACM would have had to pay monies from a condemnation award against the amount owned under the Loan. Because the Property was not taken under eminent domain through

a condemnation award and ACM sold the Property only under threat of condemnation, Fannie Mae asserts that it fully complied with its rights and obligations under the Loan Documents. Fannie Mae argues that it was not unjustly enriched, but rather enforced the terms of the Loan Documents and received the compensation the parties had contractually agreed to, and which was owed under the Loan Documents.

ACM responds that under Missouri law, unjust enrichment occurs "where a benefit is conferred upon a person in circumstances in which retention of the benefit, without paying its reasonable value, would be unjust." S & J, Inc., 108 S.W.3d at 769. ACM asserts that the Petition specifically alleges that Fannie Mae improperly forced ACM to pay hundreds of thousands of dollars in prepayment and defeasance fees pursuant to an inapplicable defeasance option when ACM was forced to sell the Property in lieu of condemnation, despite the terms of the agreements that clearly exempt sales in lieu of condemnation from the Fannie Mae defeasance program; and further forced ACM to cover the spread between the interest rates accruing under the notes executed by ACM and the "replacement collateral" Fannie Mae used in "foisting" the defeasance option upon ACM.

ACM argues that its Petition clearly alleges sufficient facts to state a claim that it was forced to confer upon Fannie Mae not only a benefit, but a premium. ACM also alleges that permitting Fannie Mae to retain these funds would be unjust because Fannie Mae took advantage of a pending condemnation and the related jeopardy ACM faced and used those circumstances as leverage to compel ACM to pay fees and costs that did not apply under the Loan Documents.

Fannie Mae replies that ACM paid the Defeasance Deposit and the Defeasance Commitment Fees because it had no right to prepay under the Note, except out of the proceeds of a condemnation award. Thus, the Defeasance Option was the only way ACM could obtain the release of the lien on the Property, because it could not prepay the Loan with a condemnation award. Fannie Mae argues

that the payment of monies called for under the terms of the Note and Security Instrument, on a voluntary basis by ACM, cannot be pleaded to be an "unjust enrichment" leading to a recovery from Fannie Mae of those sums.

Fannie Mae also argues that ACM's agreement under Sections 10(e) and (f) of the Note absolutely undermine the possibility of any unjust enrichment in the payment of the Defeasance monies to Fannie Mae, as a matter of law. ACM expressly agreed in Section 10(e) of the Note that it "recognizes that any prepayment of the unpaid principal balance of this Note, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration on payment of Lender's ability to meet its commitments to third parties." ACM also agreed "to pay to Lender upon demand damages for the detriment caused by any prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the formula for calculating prepayment premiums set forth on Schedule A represents a reasonable estimate of the damages Lender will incur because of a prepayment." Fannie Mae states that ACM acknowledged in Section 10(f) of the Note "that the prepayment premium provisions of this Note are a material part of the consideration for the loan evidenced by this Note and acknowledges that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the period payment premium provisions."

Fannie Mae argues that as a matter of law, ACM as the Borrower already agreed in the Loan Documents that the prepayment fees it paid were intended to cover the difficult-to-ascertain damages to Fannie Mae resulting from the prepayment, and that ACM received more favorable treatment in the Loan as the result of the prepayment premium provisions. Fannie Mae argues that with these

express agreements by ACM, no unjust enrichment could have occurred because ACM agreed to pay the fees expressly called for under the Defeasance option.

Missouri courts have stated that the "third element [of an unjust enrichment claim], unjust retention of the benefit, is considered the most significant and most difficult of the elements." US Bank, 314 S.W.3d at 852 (quoting Adams v. One Park Place Investors, LLC, 315 S.W.3d 742, 749 (Mo. Ct. App. 2010)). "In determining whether it would be unjust for the defendant to retain the benefit, courts consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage." S & J, Inc., 108 S.W.3d at 768 (citing Graves v. Berkowitz, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000)). "There must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit to be unjust." Id. (citing Graves, 15 S.W.3d at 64). "[T]here can be no unjust enrichment if the parties receive what they intended to obtain." US Bank, 341 S.W.3d 853. This is because an action for unjust enrichment is based on a theory of quasi contract or contract implied in the law. Id.

Here, ACM cannot show that it would be unjust for Fannie Mae to retain the benefit of the defeasance payments. These payments were expressly agreed to in the Loan Documents, and Fannie Mae did nothing more than enforce the terms of the Loan Documents. Moreover, ACM specifically agreed in the Note that the defeasance payments were intended to reimburse Fannie Mae for the expenses it would incur upon prepayment, and that in return for agreeing to the prepayment provisions, ACM received more favorable loan terms. Thus, Fannie Mae did not engage in any wrongful conduct and received only what it was intended to obtain under the Loan Documents. As a result, there can be no unjust enrichment in this case as a matter of law. See US Bank, 341 S.W.3d at 853. Id. ACM "is not entitled, under the guise of an unjust enrichment claim, to rewrite a

consensual contract in an effort" to avoid paying the defeasance fees it agreed to pay.  See id.

Fannie Mae's motion to dismiss Count IV should therefore be granted.

      E.  Joint Motion to Revise Case Management Order

The parties have filed a joint motion to revise the Case Management Order in this case to schedule a non-jury trial, as no party has requested a jury trial.  The motion will be granted, but on the Court's own motion, this matter will be tried before an advisory jury pursuant to Rule 39(c), Fed. R. Civ. P.  An amended Case Management Order will be issued to reflect this change.

**Conclusion**

For the foregoing reasons, defendant Fannie Mae's motion to dismiss plaintiff ACM's Petition for failure to state a claim upon which relief can be granted should be granted in all respects as to Counts I through IV.  As a result, it is not necessary to the Court to address Fannie Mae's argument that plaintiff's claims are also barred by the Missouri Credit Agreement Statute, Mo. Rev. Stat. § 432.047(2).

Accordingly,

**IT IS HEREBY ORDERED** that defendant Federal National Mortgage Association's Motion to Dismiss for Failure to State a Claim is **GRANTED**.  [Doc. 17]

**IT IS FURTHER ORDERED** that the parties' Joint Motion to Revise Case Management Order to Schedule a Non-Jury Trial is **GRANTED**, and this matter will be set for trial before an advisory jury on the Court's own motion.  An amended Case Management Order will issue separately.  [Doc. 36]

An order of partial dismissal will accompany this memorandum and order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  22nd  day of August, 2011.