# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

AFFORDABLE COMMUNITIES OF )
MISSOURI, )
                     )
           Plaintiff, )
                     )
     v. )          No. 4:11-CV-555 CAS
                     )
EF&A CAPITAL CORP., et al., )
                     )
           Defendants. )

## MEMORANDUM AND ORDER

This matter is before the Court on a Motion for Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, filed by remaining defendants EF&A Capital Corp. and EF&A Funding, LLC (collectively, "EFA"). Plaintiff Affordable Communities of Missouri ("ACM") opposes the motion and it is fully briefed. For the following reasons, the motion will be granted in part and denied in part.

**Background**

ACM is a limited partnership that at one time owned the Jefferson Arms Apartments ("the "Property") in St. Louis, Missouri. In 1999, ACM sought to refinance the existing secured debt on the Property. For assistance with the refinancing, ACM's principal, Barry Cohen, contacted defendant Eichler, Fayne & Associates ("EFA"),[1] a lender in the business of making loans secured by mortgages on multifamily properties. EFA operated under former defendant Federal National Mortgage Association's ("Fannie Mae") Delegated Underwriting and Servicing ("DUS") program, under which Fannie Mae purchases loans originated by EFA and serviced by EFA, with EFA and

---

[1]All references to EFA include its general partner, defendant EF&A Capital Corp., and its successor, defendant EF&A Funding, LLC.

Fannie Mae sharing the risk of loss on the loans.  Loans issued under the DUS program include

certain rules and requirements imposed by Fannie Mae for loans that will be sold to it and in the

secondary market.[2]

ACM communicated with EFA's representative Gene Glaser.  ACM states that Glaser told

Cohen the DUS program included limitations on loan prepayments that required borrowers to choose

between two forms of prepayment options – a yield maintenance option, or a defeasance option that

involved substitution of collateral instead of a loan prepayment fee.  ACM alleges that Glaser stated

the defeasance option should cost a borrower less than the yield maintenance option.  ACM asserts

that this representation was false because of Glaser and EFA's failure to use ordinary care in

obtaining or communicating accurate information, that ACM did not know the representation was

false, and that ACM relied on the representation.

ACM chose the defeasance option and not the yield maintenance option for its loan because,

based on Glaser's representations, it believed that upon any necessary defeasance under the loan,

the substitute collateral would be new securities at the then-prevailing mortgage rates for similar

properties that were available for purchase in the marketplace at the time, which matched the credit

rating in terms of the original mortgage/deed of trust placed upon the Property in connection with

the loan made by EFA.  ACM closed on the transaction with EFA and obtained a loan for

$8,175,000 (the "Loan"), which was evidenced by certain loan documents (the "Loan Documents"),

including a Multifamily Note dated April 22, 1999 with attached Schedules A, B and C (the "Note"),

and a Multifamily Open-End Deed of Trust, Assignment of Rents, and Security Agreement dated

---

[2]Fannie Mae is a government-sponsored but privately-owned enterprise chartered by Congress, 12 U.S.C. § 1216.  Fannie Mae is prohibited from originating mortgage loans, 12 U.S.C. § 1719(a)(2), but rather operates in the U.S. secondary mortgage market.

April 22, 1999 with attached Exhibits A, B and C (the "Security Instrument").  Subsequently, the Loan was sold and assigned to Fannie Mae in the secondary mortgage market.

In 2005, approximately six years after the Loan was made, the City of St. Louis ("City") threatened the use of eminent domain as a means of acquiring the Property from ACM through condemnation.  ACM alleges the City worked with another real estate developer in an effort to arrange a conveyance of the Property by ACM to the other developer in lieu of condemnation proceedings.  ACM then entered into a Purchase and Sale Agreement with the other real estate developer, which Agreement specifically stated that ACM agreed to sell the Property in lieu of the threatened condemnation.  In connection with the sale transaction, ACM contacted EFA and informed it that the sale of the Property pursuant to the Purchase and Sale Agreement was in lieu of condemnation, under threat of condemnation, and that the intended sale of the Property would not violate the prepayment prohibitions of the Loan Documents under Schedule B to the Note, notwithstanding the defeasance provisions in Schedule B and in the Security Instrument.

EFA and Fannie Mae disagreed that the prepayment prohibitions were not violated, and required ACM to proceed under the defeasance option of Exhibit B to the Security Instrument and to comply with all of the provisions in the Loan Documents relating to defeasance if ACM wanted to sell the Property and obtain the release of the lien on the Property under the Security Instrument. EFA, representing Fannie Mae, provided ACM an estimated amount of a prepayment fee which was calculated as the Defeasance Deposit under the terms of the Note and the Security Instrument.  ACM was required to give a defeasance notice and pay a defeasance commitment fee within the time frame called for by the Loan Documents in order to effectuate a substitution of collateral for the mortgaged Property and obtain the release of the lien on the Property provided under the Loan Documents, in order to allow a sale of the Property otherwise constituting the collateral for the Loan.

ACM completed the defeasance process in order to sell the Property, thereby substituting collateral which was purchased with ACM funds through the defeasance process. The substitute collateral was a Fannie Mae Investment Security with a rate of 4.8524%, determined based on the then-current yields on highly rated U.S. Treasury Securities. ACM alleges that because the rate of these securities was substantially below the 7.065% rate called for under the original Note, Security Instrument and Loan Documents encumbering the Property and the payments on the Note had to be satisfied out of the Fannie Mae Investment Security, ACM was required to pay a substantial amount over the Note balance to purchase the securities constituting the substitute collateral, to obtain the release of the lien on the Property to allow the sale to proceed.

The scheduled amount ACM owed under the Loan held by Fannie Mae was approximately $7,100,000. To obtain the release of the lien on the Property so that ACM could sell it, ACM alleges it paid a defeasance commitment fee to EFA and Fannie Mae of 1% of that loan balance. ACM also alleges it paid the Defeasance Deposit calculated by EFA and Fannie Mae in connection with the closing and release of the mortgage lien on the Property. ACM alleges it should not have had to pay these prepayment fees and that it suffered damages as a direct result of the defendants' actions in the amount of approximately $500,000.

ACM filed its Petition in state court asserting claims against EFA and Fannie Mae for negligent misrepresentation (Count I), breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and unjust enrichment (Count IV). The case was removed to this Court. By Memorandum and Order of August 22, 2011 (the "Order"), the Court granted Fannie Mae's motion to dismiss ACM's claims against it for failure to state a claim upon which relief can be granted.

EFA now moves for judgment on the pleadings on all of ACM's claims against it.

4

**Legal Standard**

Rule 12(c) of the Federal Rules of Civil Procedure provides that after the pleadings are closed, a party may move for judgment on the pleadings.  A motion under Rule 12(c) is determined by the same standards that are applied to a motion under Rule 12(b)(6).  Ginsburg v. InBev NV/SA, 623 F.3d 1229, 1233 n.3 (8th Cir. 2010).  To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A grant of judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law."  Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009) (internal quotation marks and quoted case omitted).

"Well-pleaded facts, not legal theories or conclusions, determine the adequacy of the complaint."  Id. (brackets and quoted case omitted).  "The facts alleged in the complaint must be enough to raise a right to relief above the speculative level."  Id. (internal quotation marks and quoted case omitted).  The Court must "accept as true all factual allegations set out in the complaint" and "construe the complaint in the light most favorable to the plaintiff, drawing all inferences in its favor."  Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (quoted case omitted).  "A plaintiff need only allege facts that permit the reasonable inference that the defendant is liable, even if the complaint 'strikes a savvy judge that actual proof of the facts alleged is improbable' and recovery 'very remote and unlikely.'"  Hamilton v. Palm, 621 F.3d 816, 819 (8th Cir. 2010) (quoting Braden v. Wal-Mart Stores, 588 F.3d 585, 594 (8th Cir. 2009)).

5

In considering a Rule 12(c) motion, the Court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

**Discussion**

    I.   Negligent Misrepresentation – Count I

A.

EFA moves for judgment on the pleadings on Count I, which asserts a claim for negligent misrepresentation. The parties agree that Missouri law controls this matter. "The elements of negligent misrepresentation are: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss. A party must prove every element of a claim for negligent misrepresentation for the claim to succeed." Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 134 (Mo. 2010) (en banc) (internal citation omitted).

According to EFA, the Petition alleges that its employee, Glaser, negligently made the following misrepresentations to ACM: (1) "the defeasance option should cost a borrower less than the yield maintenance option," Pet. ¶ 16; and (2) "upon a sale of property secured by an EFA and Fannie Mae loan that was included in the DUS program, Fannie Mae would provide substitute securities for the deed of trust on the [Property] at the then-prevailing mortgage rates for multifamily apartment buildings like the [Property]." Id.

EFA moves for judgment on the pleadings on the basis that ACM cannot establish the fourth element, justifiable reliance on its representations, as a matter of law. EFA argues ACM could not

6

justifiably rely on the representation that the defeasance option should cost less than the yield maintenance option, because this was an opinion or prediction about uncertain future events. EFA contends the representation necessarily related to a future event because at the time it was made, the Loan had not yet been made and the representation could only refer to a time in the future when ACM might decide to sell the Property. EFA states that by the express terms of the Loan Agreement, the cost in the future was uncertain because the Lender "in its sole discretion" could choose the "Investment Security" to serve as Substitute Collateral, which could be either a Fannie Mae Investment Security or U.S. Treasury Securities, whose cost varies over time.[3]

The Court agrees. EFA's representation that the defeasance option should cost less than the yield maintenance option in the event of a future prepayment of the Loan was a statement of opinion about a future event. The Petition alleges EFA informed ACM that Fannie Mae required it to select one of two potential prepayment options, the defeasance option or the yield maintenance option, and that "the defeasance option should cost a borrower less than the yield maintenance option." Pet. ¶ 16 (emphasis added). It is well established under Missouri law that a "claim for negligent misrepresentation generally cannot be based on unfulfilled promises or statements as to future events, unless the statement is a representation of the speaker's present intention or concerns matters within the speaker's control." Ryann Spencer Group, Inc. v. Assurance Co. of Am., 275 S.W.3d 284, 291 (Mo. Ct. App. 2008). A failure to accurately predict future circumstances does not give rise to a claim for negligent misrepresentation. See Comp & Soft, Inc. v. AT & T Corp., 252 S.W.3d 189, 197 (Mo. Ct. App. 2008).

---

[3]EFA quotes from the Modification to Instrument Defeasance Provisions, Exhibit B to the Fannie Mae Multifamily Security Instrument, Exhibit 3, at ¶¶ 54(a)(3), (h)(10).

Here, EFA offered its opinion and prediction as to which prepayment option would be less costly.  ACM's use of the word "should" in paragraph 16 of its Petition suggests the prediction of a future event based on an opinion of how the applicable Loan language would apply to the facts at the time of the transaction.  The opinion necessarily related to a potential future sale of the Property by ACM at an unknown time and, crucially, was subject to economic influences and factors over which EFA had no control.  Cf. Kelly Tire Serv., Inc. v. Kelly-Springfield Tire Co., 338 F.2d 248, 253 (8th Cir. 1964) ("At best, these projections, however persuasive in shaping plaintiff's plans, were opinions subject to the uncontrollable economic influences of free enterprise and not fraudulent misrepresentations of past or existing facts on which plaintiff justifiably relied to its detriment.").

More specifically, the Petition shows that the defeasance took place eight years after EFA's representation about the yield maintenance and defeasance options was allegedly made.  The language of the defeasance option in Section 54 of the Security Instrument (Ex. B to the Security Instrument, §§ 54(a)(1), (3), (6), (b)), indicates that the cost of the defeasance option was dependent on a number of variable factors that could not have been known with certainty to either EFA or ACM at the time of the alleged misrepresentation in 1998.  These factors affecting the cost could not be determined until the time ACM elected to proceed with the defeasance, and only then could a comparison be made to the cost of the yield maintenance option.

Variable factors set out in the Loan Documents make it clear that EFA's statement could only be a prediction of the cost of the defeasance option based on identifiable but then-unquantifiable factors to occur in the future, all of which had to be known to establish the real cost of the defeasance option in comparison to the cost of the yield maintenance option.  For example, Section 54(h)(1) provides the definition of "Annual Yield" which is dependent on variable published yields in place at the time of the Defeasance Notice.  The "Defeasance Commitment Fee" under

Section 54(h)(5) can be two different amounts depending on whether the Successor Borrower is designated by the Borrower or the Lender.  The "Defeasance Deposit" under Section 54(h)(6) is dependent on present value calculations performed at a time dependent on the Defeasance Closing Date.  The "Investment Security" serving as the Substitute Collateral in the defeasance was either a Fannie Mae Investment Security purchased in the market or U.S. Treasury Securities, on which the cost and return varied at all times.  Further, these variables were dependent on overall economic conditions, interest rates, and the timing of the defeasance selected by ACM.  These variables could be made certain only at the time of Defeasance Closing, as shown from the applicable language of the Loan Documents.

The variable factors set out in the Loan Documents make it clear that EFA's statement was a prediction of the cost of the defeasance option based on recognizable but then-unknown factors to occur in the future, all of which had to be known to establish the real cost of that option. Therefore, EFA's alleged misrepresentation was a prediction of a future event and is not actionable, as a matter of law.[4]

---

[4]Count I of the Petition alleges in pertinent part that EFA negligently misrepresented in 1998 that upon any future prepayment, the defeasance option would cost ACM less than the yield maintenance option.  The Petition does not, however, allege what ACM's cost would have been upon prepayment in 2006 had it selected the yield maintenance option instead of the defeasance option.  The Petition also does not allege that the yield maintenance option was in fact less expensive than the defeasance option.  Presumably, the correct measure of damages on Count I as pleaded would be the difference between what it would have cost ACM to prepay the Loan under the yield maintenance option and what it actually cost ACM to prepay it under the defeasance option.  Or perhaps, the measure of damages would be the difference between the cost of the defeasance option as promised by EFA (i.e., substitute securities at the then-prevailing mortgage rates for multifamily apartment buildings like the Property, Pet. ¶ 16), and the cost of the defeasance option as actually determined by Fannie Mae and EFA, substituting securities based on then-current yields on highly rated U.S. Treasury Securities.

As a result, when the Petition is construed in the light most favorable to ACM and all reasonable inferences are drawn in its favor, the Petition does not state a plausible claim for negligent misrepresentation with respect to the representation that the defeasance option should have been less costly for ACM.  EFA's motion for judgment on the pleadings should be granted on this claim.

B.

EFA also moves for judgment as a matter of law on the second alleged misrepresentation, that upon a sale of the Property, Fannie Mae would provide substitute securities for the deed of trust on the Property at the then-prevailing mortgage rates for multifamily apartment buildings like the Property.  EFA argues that ACM cannot justifiably rely on this representation, even if EFA did misrepresent the legal effect of the terms, because the express terms of the Loan Agreement describe how prepayment and defeasance would operate.

EFA cites Missouri case law for the proposition that a party "cannot defeat the enforcement of a provision of a . . . contract by a mere showing that the other party misrepresented its legal effect or gave assurances that the same would not be binding or enforced."  St. Joseph Lead Co. v. Fuhrmeister, 182 S.W.2d 273, 279 (Mo. 1944).  Also, "A contracting party is bound by the terms of the written contract he or she executes."  Hamra v. Magna Group, Inc., 956 S.W.2d 932, 940 (Mo. Ct. App. 1997).  "[The law] is not an indulgent guardian which can go to romantic length of giving protection against consequences of indolence, folly or careless indifference to ordinary and accessible means of information."  Id. (quoted case omitted).

EFA asserts that under Hamra, it is entitled to judgment on this claim.  In Hamra, the plaintiff, a former bank director, claimed coverage under the bank's deferred compensation plan, saying he was told by an insurance agent hired by the bank to market the plan that compensation

10

would be payable when he reached age 65, whether or not he remained a director.  A provision in the written plan, however, clearly terminated any company obligation if service as a director terminated prior to the individual's 65th birthday.  Id. at 935-36.  The former director had received a copy of the plan and participation agreement before he met with the agent to discuss his possible participation.  Id. at 940.  The agent's testimony supported the plaintiff's case, as he testified he was instructed by bank personnel that directors would receive their full benefits if they reached age 65, and no one advised him that a director who was terminated before reaching age 65 would only receive an assignment of some life insurance.  Id.  Nonetheless, the Missouri Court of Appeals affirmed summary judgment for the bank on the former director's negligent misrepresentation claim, holding the plaintiff could not justifiably rely on the agent's representations because they were contrary to the plain language of the plan.  Id.

ACM argues that Hamra is distinguishable because Mr. Hamra received a copy of the plan language and had the opportunity to read it before he talked with the agent and decided to enter into the plan, whereas ACM did not have access to the Loan Documents until after it had made a $165,000 Rate Lock Payment based on its understanding of the Loan terms as misrepresented by EFA, and stood to lose all of that payment if it did not go through with the transaction.  ACM also asserts that while Mr. Hamra was described as an "experienced attorney and businessman," in this case EFA had superior knowledge about the transaction and held itself out as having "specialized experience and knowledge in DUS program loans and the features, terms, and operation of the program."  Pl.'s Mem. Opp. at 12.[5]

_____

[5]The Petition alleges that ACM "had no experience with defeasance options under the loan agreements, or knowledge of the specific terms of a defeasance option under the DUS program of Fannie Mae."  Pet. ¶ 19.  ACM also alleges that the forms used by EF&A and EFA were standardized Fannie Mae documents that "could not be negotiated and must be executed without

EFA replies that the <u>Hamra</u> decision did not focus on the fact that the plaintiff received the plan documents and could have read them before the misrepresentations were made, but instead focused on the fact that, as here, the plaintiff "had received and executed the contract documents such that there was 'no justifiable basis for him to have relied on statements by the insurance agent contrary to the plain language of the plan.'" Defs.' Reply at 4 (quoting <u>Hamra</u>, 956 S.W.2d at 940). EFA further replies that the Petition shows ACM is a sophisticated investor because it was the owner of the Property since 1993 and "invested funds in a number of renovation and modernization programs at the facility," Pet. ¶ 9; sought a loan for over $8 million dollars, <u>id.</u> ¶ 23; and was a California limited partnership that recently merged in to a Nevada limited partnership, <u>id.</u> ¶ 1.

Missouri law is clear that a person cannot evade contractual obligations by claiming he did not read a contract, even if he was told the contract said something that it does not. <u>See</u>, <u>e.g.</u>, <u>Sanger v. Yellow Cab Co., Inc.</u>, 486 S.W.2d 477, 481 (Mo. 1972) (en banc) ("The rule is that the one who signs a paper, without reading it, if he is able to read and understand, is guilty of such negligence in failing to inform himself of its nature that he cannot be relieved from the obligation contained in the paper thus signed, unless there was something more than mere reliance upon the statements of another as to its contents[.]") (quoting <u>Higgins v. American Car Co.</u>, 22 S.W.2d 1043, 1044 (Mo. 1929)); <u>St. Joseph Lead</u>, 182 S.W.2d at 279 (A party "cannot defeat the enforcement of a provision

---

change." <u>Id.</u> ¶ 22.  ACM alleges that it was pressured into paying the rate lock payment to lock in the interest rate offered under the Loan Commitment without seeing the Loan Documents that described the defeasance option. <u>See</u> Pet. ¶¶ 25-28. ("The financial terms of the Defeasance Option were not set forth in the Loan Commitment.  Rather, the Loan Commitment stated that the Defeasance Option may be exercised 'per the terms of the loan documents' . . .[which] were not included with the Loan Commitment delivered to Affordable.")  Pet. ¶ 24.  ACM alleges that upon payment of the Rate Lock Payment, it "had no alternative other than to execute whatever standardized Fannie Mae loan documents were submitted by [EFA], unless it was willing to forfeit the entire Rate Lock Payment."  Pet. ¶ 27.

of a . . . contract by a mere showing that the other party misrepresented its legal effect or gave assurances that the same would not be binding or enforced.").

The Missouri Supreme Court appears to recognize the possibility, however, that a different result may be appropriate if a party has not had a reasonable opportunity to know about the terms of a contract by reading it, State ex rel. PaineWebber, Inc. v. Voorhees, 891 S.W.2d 126, 130 (Mo. 1995) (en banc), or has been pressured, influenced, rushed, or denied the opportunity to read the contract.  See Sanger, 486 S.W.2d at 481.

The Court finds that ACM's allegations, accepted as true and construed in the light most favorable to ACM, raise issues of fact as to whether EFA misrepresented the terms of the defeasance option, whether ACM was denied the opportunity to see the Loan Documents before it entered into the Rate Lock Payment, whether ACM was pressured into paying the Rate Lock Payment to lock in the interest rate offered under the Loan Commitment without seeing the Loan Documents that described the defeasance option, and whether after making that payment it had no alternative but to execute the standard Fannie Mae Loan Documents, or forfeit the entire Rate Lock Payment.[6]  Pet. ¶¶ 25-28.  As a result, the Court cannot determine as a matter of law that ACM's execution of the Loan Documents precludes this cause of action.

For these reasons, EFA has not established that it is entitled to judgment on ACM's negligent misrepresentation claim based on EFA's representation that upon any necessary defeasance under the loan, the substitute collateral would be new securities at the then-prevailing mortgage rates for similar properties that were available for purchase in the marketplace at the time, which matched the

---

[6]EFA argues that ACM's action in proceeding to execute the Loan Documents was a business decision, but this argument raises issues that are outside the pleadings and cannot be resolved on a motion for judgment on the pleadings.

credit rating in terms of the original mortgage/deed of trust placed upon the Property in connection with the loan made by EFA.

II.  <u>Breach of Contract – Count II</u>

EFA moves for judgment on the pleadings on Count II, which asserts a claim for breach of contract.  In Count II, ACM alleges that under the terms of the Loan Documents, it should have been allowed to prepay the remaining Loan balance without any cost or penalty upon its conveyance of the Property in lieu of condemnation, but EFA and Fannie Mae wrongly required it to comply with defeasance provisions in the Security Instrument requiring payment of a defeasance commitment fee and Defeasance Deposit.

Under Missouri law, the essential elements of a breach of contract action are: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." <u>Keveney v. Missouri Military Acad.</u>, 304 S.W.3d 98, 104 (Mo. 2010) (en banc).

In the Order, the Court held that Fannie Mae was entitled to dismissal of ACM's breach of contract claim as a matter of law.  EFA argues that because Fannie Mae was entitled to dismissal of the claim as a matter of law, it is entitled to judgment on the pleadings because the same conduct by it cannot constitute a breach of contract.  EFA relies on the law of the case doctrine in support of its motion.  ACM responds that the law of the case doctrine "does not apply at this stage" because the Court's interlocutory ruling as to Fannie Mae is not final, and asserts that EFA is "in a different posture" than was Fannie Mae.  Pl.'s Mem. Opp. at 1.

In the Order, the Court granted Fannie Mae's motion to dismiss Count II, concluding that the clear and unambiguous terms of the Loan Documents specifically establish that a condemnation

award, not the threat of condemnation, was required for ACM to avoid the prepayment premium, and therefore no breach of contract occurred:

> Because the unambiguous language of the Note and Security Instrument establishes that ACM had no right to prepay the Loan at the time of its sale of the Property in lieu of or under threat of condemnation, Fannie Mae's enforcement of its contractual right to receive the defeasance commitment fee and Defeasance Deposit upon ACM's sale of the Property did not constitute a breach of the Note or Security Instrument, as a matter of law.

Mem. and Order of Aug. 22, 2011 at 16.  In reaching this conclusion, the Court rejected ACM's contention that Paragraph 20 of the Security Instrument allowed it to prepay without penalty upon a sale of the Property in lieu of or under threat of condemnation.  Id.  The Court concluded that under the Loan Documents, ACM had to receive a formal condemnation award and then apply the proceeds of that award to the Loan in order to prepay the Loan without penalty.  Id.  Because the Petition alleges that ACM did not receive a formal condemnation award, but rather chose to sell the Property in lieu of or under the threat of a formal condemnation, the Court held that Count II failed to state a claim as a matter of law and dismissed it as against Fannie Mae.

ACM concedes that the "Court may well reach the same result on [the breach of contract claim] as it did on Fannie Mae's motion to dismiss," Pl.'s Mem. Opp. at 14, but argues that EFA "in interpreting the Note and Security Agreement to require ACM to pay the defeasance commitment fee and defeasance deposit, breached the contract with ACM or, at the very least, failed to treat ACM with good faith and fair dealing."  Id. at 14-15.  ACM contends that it and EFA had a

> meeting of the minds at closing on how the defeasance provision would work.  The "contract" was not silent on these points; Fannie Mae's applications of its standards and practices, however, was contrary to the terms represented and initially agreed. EFA later adopted those interpretations contrary to their representations to ACM.

Id. at 15.

As ACM observes, the Order dismissing its claims against Fannie Mae is interlocutory and could be reconsidered at any time prior to entry of a final judgment.  See First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 620 (8th Cir. 2007).  Nonetheless, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Id. (quoted case omitted).  "A court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona v. California, 460 U.S. 605, 618, n.8 (1983)).

Here, ACM offers no argument or citation to legal authority suggesting that the Court's decision granting Fannie Mae's motion to dismiss the breach of contract claim was erroneous or manifestly unjust.  ACM also does not make any specific arguments as to why the Court's prior decision should not apply to ACM's breach of contract claim against EFA.

The Petition alleges that ACM should have been able to prepay the Loan without penalty when it sold the Property in lieu of condemnation.  The Court disagreed, and determined that under the language of the Loan Documents, Fannie Mae properly enforced its contractual right to receive defeasance fees where ACM sold the Property in lieu of condemnation.  When all facts pleaded in the Petition are accepted as true and construed in the light most favorable to ACM, and all reasonable inferences are granted in its favor, there is no basis for the Court to conclude that ACM's allegations concerning EFA's conduct in enforcing the explicit contractual right to receive defeasance fees upon ACM's sale of the Property state a claim to relief for breach of contract that

16

is plausible on its face.[7]  EFA's motion for judgment on the pleadings should therefore be granted as to Count II.

III.  Breach of the Covenant of Good Faith and Fair Dealing – Count III

EFA moves for judgment on the pleadings on Count III, which asserts a claim for breach of the implied covenant of good faith and fair dealing.  In Count III, ACM does not specifically allege how EFA and Fannie Mae breached the covenant of good faith and fair dealing, but rather states, "EFA, acting through EF&A Capital Corp., and Fannie Mae have materially breached the covenant of good faith and fair dealing in the Note and Security Instrument."  Pet. ¶ 71.  EFA states that in opposing Fannie Mae's motion to dismiss, ACM clarified that EFA and Fannie Mae misrepresented "the benefits and operation of Fannie Mae's defeasance option under the subject loan" and leveraged an interest rate lock-in fee of $165,000, which would be forfeited if ACM chose not to close the loan, that "opportunistically compelled ACM to enter into a loan transaction at variance with that which had been promised."  Pl.'s Mem. Opp. to Def. Fannie Mae's Mot. Dismiss at 23.  ACM also argued that a breach of the covenant occurred because Fannie Mae refused to release its lien without receiving defeasance fees and costs.  Id.

The Court rejected ACM's theory that Fannie Mae breached the covenant of good faith and fair dealing by misrepresenting the terms of the defeasance option, because it found there was no agency relationship between Fannie Mae and EFA before Fannie Mae purchased the Loan.  As a result, Fannie Mae could not be liable for any pre-purchase representations made by EFA.  See Mem.

---

[7]The Petition does not contain any factual allegations that EFA told ACM it could prepay the Loan without penalty if it sold the Property under threat of or in lieu of foreclosure, but rather only alleges that EFA gave it incorrect information about the nature of the substitute securities upon defeasance.  ACM's vague assertion in its opposition memorandum that it had a "meeting of the minds" with EFA "on how the defeasance provision would work" does not offer any support for its breach of contract claim, which fails based on the language contained in the Loan Documents.

and Order of Aug. 22, 2011, at 20.  The Court rejected the theory that Fannie Mae breached the covenant by refusing to release its lien without payment of the defeasance fees and costs, because it determined that the Loan Documents entitled Fannie Mae to collect under the defeasance option upon sale of the Property.  Id. at 20-21.  The Court concluded, "Fannie Mae merely enforced the terms of the Loan Documents and did nothing that prevented or hindered ACM in the performance of the contract, evaded the spirit of the transaction, or deprived ACM of its expected contractual benefits."  Id. at 21.

In support of its motion, EFA argues that it is entitled to judgment as a matter of law because the Loan Documents expressly describe the benefits and operation of the defeasance option, and therefore there can be no breach of the covenant of good faith and fair dealing.  EFA cites Giessow Restaurants, Inc. v. Richmond Restaurants, Inc., 232 S.W.3d 576, 579 (Mo. Ct. App. 2007) ("A court will not 'find an implied covenant if the parties have either dealt expressly with the matter or have intentionally left the contract silent on the point.'" (quoting Crestwood Plaza, Inc. v. Kroger, 520 S.W.2d 93, 97 (Mo. Ct. App. 1974)); and Bishop v. Shelter Mutual Insurance Co., 129 S.W.3d 500, 505 (Mo. Ct. App. 2004) ("Another general principle is that 'there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.'").

ACM argues that the Giessow case is distinguishable because it did not concern a covenant of good faith and fair dealing, but rather whether a covenant of continuous business use should be read into a lease agreement silent on the issue.  Id., 232 S.W.3d at 578.  ACM also states that the covenant of good faith and fair dealing, which is implied in all Missouri contracts, "prevents a party from exercising a judgment conferred by the express contract 'in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract."  Owen v.

General Motors Corp., 533 F.3d 913, 921 (8th Cir. 2008) (quoting Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 473 (Mo. Ct. App. 1986)).  ACM does not, however, explain why the Court's decision on Fannie Mae's motion to dismiss Count III should not apply to ACM's claim against EFA, or otherwise discuss why judgment on the pleadings is not appropriate here.

As the Court stated in the Order, under Missouri law, "There is a promise implied in every contract not to prevent or hinder performance by the other party and a breach of this implied promise constitutes a breach of contract."  Housley v. Mericle, 57 S.W.3d 360, 363 (Mo. Ct. App. 2001) (citations omitted).  A claim for breach of the implied covenant of good faith and fair dealing is a contractual claim.  Hardee's Food Sys., Inc. v. Hallbeck, 776 F.Supp.2d 949, 952 (E.D. Mo. 2011) (citing Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 413 (Mo. Ct. App. 2000)).  "In order to succeed on a breach of contract, a plaintiff must show the making of a valid enforceable contract between the plaintiff and defendant, the right of the plaintiff and obligation of the defendant under the contract, a violation by the defendant, and damages resulting to the plaintiff from the breach."  Koger, 28 S.W.3d at 412 (cited case omitted).  "The party claiming breach of the implied covenant of good faith must present substantial evidence that it has been violated."  Schell v. LifeMark Hosps. of Missouri, 92 S.W.3d 222, 230 (Mo. Ct. App. 2002).

The duty of good faith and fair dealing under Missouri law "prevents one party to the contract from exercising a judgment conferred by the express terms of [the] agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract."  Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 466 (8th Cir. 2002) (quoting Amecks, Inc. v. Southwestern Bell Tel. Co., 937 S.W.2d 240, 243 (Mo. Ct. App. 1996)).  "'[T]he implied duty of one party to cooperate with the other party to a contract to enable

performance and achievement of expected benefits is an enforceable right.'" Id. at 467 (quoting Koger, 28 S.W.3d at 412).

The implied duty of good faith and fair dealing is "incapable of altering the express terms of [an] agreement" and "cannot give rise to new obligations not otherwise contained in a contract's express terms." Stone Motor, 293 F.3d at 466 (internal quotation marks and quoted case omitted). The Eighth Circuit has described the implied duty as serving "merely as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting." Id. (quoted case omitted). "Since good faith is merely a way of effectuating the parties['] intent in unforeseen circumstances, the implied covenant has nothing to do with the enforcement of terms actually negotiated and cannot block [the] use of terms that actually appear in the contract." Id. (quoted case omitted).

Based on the foregoing authorities, the Court concludes as a matter of law that ACM cannot assert a claim against EFA for breach of the covenant of good faith and fair dealing based on enforcement of the defeasance option when ACM sold the Property in lieu of foreclosure.  This is because the Loan Documents specifically allowed EFA and Fannie Mae to require payment of defeasance fees and costs upon such a sale, as more fully discussed in the Order.  As stated above, the implied duty of good faith and fair dealing is incapable of altering the express terms of an agreement.  Stone Motor, 293 F.3d at 466.

The Court also concludes as a matter of law that ACM cannot assert a claim for breach of the covenant of good faith and fair dealing based on EFA's alleged misrepresentation concerning the terms of the defeasance option, the requirement of the rate-lock payment, and the "opportunistic" compelling of ACM to enter into the Loan.  The implied promise in every Missouri contract is "not to prevent or hinder performance by the other party[.]" Housley, 57 S.W.3d at 363.  As the Eighth Circuit has explained, the duty of good faith and fair dealing "prevents one party to the contract from

exercising a judgment conferred by the express terms of [the] agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 467

ACM's claim against EFA in Count III does not fit within the parameters of a claim for breach of the duty of good faith and fair dealing. ACM does not allege that EFA prevented or hindered its performance, or exercised a judgment conferred by the express terms of the Loan Documents in a manner to "evade the spirit of the transaction" or deny ACM "the expected benefit of the contract." These are the kinds of allegations that would be needed to assert a breach of the duty of good faith and fair dealing claim. Instead, ACM alleges that EFA misrepresented the terms of the Loan Documents and then essentially forced it to execute those documents or lose its $165,000 rate-lock payment. These are the same factual allegations that underlie ACM's negligent misrepresentation claim, which ACM attempts to shoehorn into a claim for breach of the duty of good faith and fair dealing.

The Eighth Circuit has explained that to establish the existence of a question of material fact regarding breach of the duty of good faith and fair dealing in the summary judgment context, a party must present evidence tending to establish that the other party exercised its discretion "so as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." Stone, 293 F.3d at 467 (quoting Amecks, 937 S.W.2d at 243). The Eighth Circuit's reasoning in Stone is properly modified and applied to this case. To be entitled to judgment on the pleadings, EFA must show that ACM has failed to plead facts from which it may be reasonably implied that EFA exercised its discretion under the Loan Documents to evade the spirit of the transaction or deny ACM the expected benefit of the contract. When all facts pleaded in the Petition are accepted as true and construed in the light most favorable to ACM, and all reasonable inferences are granted in its

21

favor, there is no basis for the Court to conclude that EFA's conduct as pleaded could state a claim for breach of the covenant of good faith and fair dealing that is plausible on its face.  EFA is therefore entitled to judgment on this claim.

IV.  <u>Unjust Enrichment – Count IV</u>

Finally, EFA moves for judgment on the pleadings on Count IV, which asserts a claim for unjust enrichment.  In Count IV, ACM alleges that when EFA and Fannie Mae required it to comply with the defeasance provisions of the Loan Documents and pay the defeasance commitment fee and defeasance deposit, EFA was enriched, and it would be inequitable to allow EFA to retain the economic benefit of the amounts represented by the defeasance commitment fee and deposit.

Under Missouri law, "An unjust enrichment has occurred where a benefit was conferred upon a person in circumstances in which retention of the benefit, without paying its reasonable value, would be unjust." <u>S & J, Inc. v. McLoud & Co., L.L.C.</u>, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003). The elements of unjust enrichment are (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of that benefit; and (3) acceptance and retention of the benefit under such circumstances that it would be inequitable for defendant to retain the benefit without paying for its value.  <u>US Bank Nat'l Ass'n v. Cox</u>, 341 S.W.3d 846, 852 (Mo. Ct. App. 2011) (cited cases omitted).

The third element of an unjust enrichment claim, "unjust retention of the benefit, is considered the most significant and most difficult of the elements." <u>US Bank</u>, 341 S.W.3d at 852 (quoting <u>Adams v. One Park Place Investors, LLC</u>, 315 S.W.3d 742, 749 (Mo. Ct. App. 2010)).  "In determining whether it would be unjust for the defendant to retain the benefit, courts consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage." <u>S & J, Inc.</u>, 108 S.W.3d at 768 (citing <u>Graves v. Berkowitz</u>, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000)).

"There must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit to be unjust." Id. (citing Graves, 15 S.W.3d at 64). "[T]here can be no unjust enrichment if the parties receive what they intended to obtain." US Bank, 341 S.W.3d at 853. This is because an action for unjust enrichment is based on a theory of quasi contract or contract implied in the law. Id.

In support of its motion, EFA states that the Court held as a matter of law in the Order that ACM could not assert an unjust enrichment against Fannie Mae because Fannie Mae did not engage in any wrongful conduct and received only what the parties intended it to obtain under the Loan Documents. Mem. and Order of Aug. 22, 2011, at 24. EFA states that ACM alleges EFA was unjustly enriched through the same conduct and in the same manner as Fannie Mae and, therefore, under the law of the case doctrine, EFA cannot be found to be unjustly enriched as a matter of law.

ACM responds that EFA is not similarly situated to Fannie Mae, because ACM alleges that EFA, among other things, induced ACM to enter into a loan agreement on the basis of negligently false statements and, as loan servicer, later forced ACM to pay fees and other costs. ACM states that the Petition alleges EFA knew or should have known from its loan servicing operations how a defeasance program would operate in comparison to a yield maintenance option but apparently did not, and that EFA was enriched by its error. ACM argues it would be inequitable to permit EFA to solicit and secure the loan on incorrect representations, evade any responsibility for its error, and earn substantial transaction fees and profits, and ongoing servicing fees, while ACM is left with undisclosed or inaccurately presented loan term descriptions that cost it a premium over the debt it owed in the first place. ACM contends that its unjust enrichment claim against EFA is different than its claim against Fannie Mae, because EFA controlled its representations and is responsible for them.

23

EFA replies that because the terms of the Loan were disclosed and presented in the contract documents that ACM chose to execute, EFA, like Fannie Mae, was only enforcing the terms of the Loan Documents and received what it was intended to obtain, such that there can be no unjust enrichment as a matter of law.

The law of the case doctrine does not entitle EFA to judgment as a matter of law on this claim.  The Court found no fault on the part of Fannie Mae because Fannie Mae had not engaged in wrongful conduct, EFA's representations could not be attributed to Fannie Mae as a matter of law, and Fannie Mae did nothing more than enforce the terms of the Loan Documents.  Mem. and Order of Aug. 22, 2011, at 9-11, 24.  Because the Petition accuses EFA of wrongful conduct, EFA and Fannie Mae are not similarly situated for purposes of the unjust enrichment claim.  EFA is therefore not entitled to judgment as a matter of law merely because the Court determined that Fannie Mae was entitled to dismissal.  As this is the only basis for judgment asserted in EFA's motion, EFA has failed to meet its burden of proof.

Further, EFA has not cited any Missouri authority to establish that a party cannot assert an unjust enrichment claim as a matter of law where it claims that a defendant engaged in wrongful conduct in order to obtain a contract, and then received the benefits of that contract.  Without citation to such authority, judgment as a matter of law is not warranted.  EFA's motion to dismiss Count IV should therefore be denied.[8]

_____

[8]ACM acknowledges in its opposition memorandum that "one might interpret the [Petition] as limiting the unjust enrichment cause of action to defeasance fees and costs[.]"  Pl.'s Mem. Opp. at 14.  This is a reasonable interpretation, because Count IV asserts only that it would be inequitable for EFA "to retain the economic benefit of the amounts representing the defeasance commitment fee and the Defeasance Deposit paid by ACM," Pet. ¶ 75, and the prayer for relief in Count IV asks that EFA be required to repay the defeasance commitment fee and Defeasance Deposit.  Pet. 18. Although ACM asks in its opposition memorandum for leave to file an amended complaint to address this issue, Pl.'s Mem Opp. at 2 & n.2, 14 & n.4, a party must submit the proposed

**Conclusion**

For the foregoing reasons, EFA's motion for judgment on the pleadings should be granted as to (1) the negligent misrepresentation claim in Count I based on the representation that the defeasance option "should" cost less than the yield maintenance option upon defeasance, (2) the breach of contract claim in Count II, and (3) the breach of the covenant of good faith and fair dealing claim in Count III; and denied as to (1) the negligent misrepresentation claim in Count I based on the representation that upon defeasance, Fannie Mae would provide substitute securities for the deed of trust on the Property at the then-prevailing mortgage rates for multifamily apartment buildings like the Property, and (2) the unjust enrichment claim in Count IV. EFA's request for costs and attorneys' fees is denied without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that defendants EF&A Capital Corp. and EF&A Funding, LLC's Motion for Judgment on the Pleadings is **GRANTED in part** and **DENIED in part**; the motion is **GRANTED** as to:

(1) the negligent misrepresentation claim in Count I based on the representation that the defeasance option "should" cost less than the yield maintenance option upon defeasance,

(2) the breach of contract claim in Count II, and

---

amendment along with a motion to preserve the right to amend. In re 2007 Novastar Financial, Inc., Secs. Litig., 579 F.3d 878, 884-85 (8th Cir. 2009) (quoted case omitted); see also Case Management Order at 2, ¶ I.c. (Doc. 32). "[P]lacing a footnote in a resistance to a motion to dismiss requesting leave to amend in the event of dismissal is insufficient." Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1030 (8th Cir. 2011) (cited cases omitted).

Because the Case Management Order's deadline for amending pleadings was October 14, 2011, the good cause standard of Rule 16(b), not the standard of Rule 15(a), would apply to any motion for leave to file an amended complaint. See Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716 (8th Cir. 2008); Popoalii v. Correctional Med. Servs., 512 F.3d 488, 497 (8th Cir. 2008).

(3) the breach of the covenant of good faith and fair dealing claim in Count III;

and the motion is **DENIED** as to:

(1) the negligent misrepresentation claim in Count I based on the representation that upon defeasance, Fannie Mae would provide substitute securities for the deed of trust on the Property at the then-prevailing mortgage rates for multifamily apartment buildings like the Property, and

(2) the unjust enrichment claim in Count IV.  [Doc. 41]

An appropriate partial judgment will accompany this memorandum and order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  9th  day of January, 2012.