UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| AFFORDABLE COMMUNITIES | ) |
| OF MISSOURI, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:11 CV 555 CDP |
| | ) |
| FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

Plaintiff Affordable Communities of Missouri, L.P. sued Federal National Mortgage Association ("Fannie Mae") for breach of contract, alleging that Fannie Mae breached their loan agreement by requiring Affordable to pay a premium after Affordable sold its collateral property and paid off the loan early. Affordable believes the premium was not owed because the property was at risk of condemnation and so qualified for the loan's "condemnation award" exception to the premium.

This court previously dismissed Affordable's complaint after agreeing with Fannie Mae that a "condemnation award" did not include a conveyance in lieu of condemnation. The Court of Appeals for the Eighth Circuit reversed, holding that

the term is ambiguous, and remanded to this court. *Affordable Cmtys.of Mo. v. Fed. Nat'l Mort. Ass'n.,* 714 F.3d 1069 (8th Cir. 2013).

Affordable now seeks summary judgment, arguing, among other things, that the Court of Appeals' opinion dictates that Affordable's interpretation of the contract is correct. That is wrong: the Court of Appeals merely reversed the dismissal and held that "the agreement is ambiguous as to whether 'condemnation award' includes a sale in lieu of condemnation." 714 F.3d at 1076. Now, after discovery and on the summary judgment record, Fannie Mae has shown that genuine factual disputes exist about the meaning of the contract. Among other things, there is evidence that Affordable took actions inconsistent with its proffered definition of "condemnation award." Whether Affordable's sale of the property was actually made in lieu of condemnation is also a remaining factual issue. As genuine disputes of material fact remain, Affordable's motion for summary judgment will be denied.

## **Background**[1]

Affordable is a Nevada limited partnership in the commercial real estate business. Barry Cohen owns 99% of Affordable in his capacity as limited partner, and he serves as president of its general partner. From 1993 to 2006, Affordable

---

[1] These facts are set out for summary judgment purposes only, and do not relieve any party of the burden of presenting evidence at trial.

owned the Jefferson Arms Apartments, a building in downtown St. Louis, Missouri.

In August 1998, Affordable contacted Eichler, Fayne, and Associates (EFA) to refinance its existing secured debt on the Jefferson Arms. EFA originates loans secured by mortgages on multifamily properties like Jefferson Arms and operates exclusively under Fannie Mae's delegated underwriting and servicing (DUS) program. Fannie Mae uses the DUS program to purchase loans on the secondary mortgage market. Fannie Mae imposes certain requirements on loans originated through the DUS program, and originators share with Fannie Mae the associated risk of loss on any such loans.

To ensure that Fannie Mae realizes the expected interest, early payments on DUS loans are penalized. The EFA representative gave Affordable the choice between one of two prepayment penalties, each calculated to ensure that Fannie Mae would collect no less if Affordable repaid the debt early. Affordable selected the "defeasance" option, which would allow Fannie Mae to use prepayment funds to purchase securities at the prevailing rate for mortgages on multifamily apartment buildings. Fannie Mae would then substitute those assets for its lien on Jefferson Arms.

EFA agreed to lend Affordable approximately $8 million. In April 1999, they executed loan documents consisting of a "Fannie Mae Multifamily Note" and

a "Fannie Mae Multifamily Security Instrument." After executing the loan, EFA sold and assigned it to Fannie Mae in the secondary mortgage market.

From 1999 through 2004, Affordable invested over $10 million in updating, maintaining, and rehabilitating the Jefferson Arms. During that time, the building received only minor code violations and passed inspections required by Fannie Mae to ensure the protection of its collateral.

In 2004, an entity primarily owned by Cohen and associated with Affordable purchased St. Louis Centre, a failed shopping center which was also in downtown St. Louis. At some point in 2004 or 2005, Cohen had conversations with Tom Reeves, an individual involved in a non-profit entity dedicated to the redevelopment of downtown St. Louis. Reeves requested that Cohen make structural changes to St. Louis Centre and implied that failure to do so would result in an attempt to have both St. Louis Centre and the Jefferson Arms condemned for code violations.

On October 18, 2005, Affordable entered into a Purchase and Sale Agreement to sell the Jefferson Arms to Pyramid Construction, Inc. Pyramid, which also contracted to buy St. Louis Centre, initially only wanted to buy the shopping center. After Cohen made that sale contingent upon Pyramid's purchase of the Jefferson Arms, Pyramid agreed to buy both properties.

The Purchase and Sale Agreement for the Jefferson Arms included a recitation stating that the Jefferson Arms was being sold under threat of condemnation. The Agreement also required Pyramid to obtain a letter from the City of St. Louis to Affordable memorializing the threat:

> Buyer shall cause to be delivered to Seller a letter addressed to the Seller from the City of St. Louis, Missouri, or an agency thereof, confirming the threat of condemnation referenced in the first page of this Agreement, which letter shall be in form and substance acceptable to Seller, on or before November 7, 2005. If such letter is not delivered to Seller as aforesaid, then Seller shall have the right to terminate this Agreement by giving Buyer written notice thereof.

Cohen had requested the recitation and obligation that Pyramid obtain the letter about condemnation. He testified that he did so, in part, because he would receive favorable tax treatment and additional time to reinvest the proceeds from sale of a condemned building. Cohen Dep. at 127.

On November 4, 2005, Barbara Geisman, Executive Director for Development of the City of St. Louis, wrote a letter to Affordable regarding the Jefferson Arms:

> This letter is to advise you that the City of St. Louis has been concerned about the future of the Jefferson Arms property for some time. At one point, you threatened to turn it into a homeless shelter. Although it is the City's belief that this threat was an empty one, the threat nevertheless became cause for concern about your intentions with respect to the property. It is our further understanding that the garage is in a serious state of disrepair. It is the City's belief that significant improvements to the property are necessary in order to keep the property from descending into an unacceptable state of blight. Should you fail to make continuing and significant

> improvements to the property, the City will seek to pass legislation authorizing the use of eminent domain in order for a responsible developer to acquire the property and improve it, and, if such a developer does not voluntarily acquire the property, seek to acquire the property by condemnation and eminent domain.

This was the only direct communication from the City to Affordable that discussed condemnation of the Jefferson Arms.

On December 8, 2005, Cohen wrote to EFA reporting that a sales contract had been signed for the Jefferson Arms and requesting a preliminary defeasance analysis. Four days later, Cohen provided a copy of the Pyramid Purchase and Sale Agreement and asked whether EFA had "any concerns about the property being sold under the threat of condemnation." Cohen, however, did not include a copy of the Geisman letter or provide any other information about any threat of condemnation.

EFA requested further information from Affordable on January 18, 2006, including "details on any changes of ownership or management of the Property" and "market issues negatively impacting the Property." Fannie Mae app. at 271. EFA provided the preliminary defeasance analysis on February 7, 2006. Three days later, Affordable's counsel wrote to EFA requesting a new defeasance analysis to be conducted under three different scenarios. Counsel also requested that the calculations presume final payment in accordance with their "observ[ation] that the Note is prepayable without premium or defeasance 90 days prior to the . . .

maturity of the Note." Affordable app. at 167. During these communications, Affordable and its counsel never raised the argument it now urges – that no defeasance fee at all was required because the building was being sold under threat of condemnation.

Affordable completed the defeasance process in July 2006. As part of the defeasance, Affordable purchased a substitute investment with a rate of 4.8524%. That rate was below the Note's rate of 7.065%. Because of the lower investment rate and payment of a 1% defeasement deposit, Affordable ultimately paid $421,859.70 more than the balance on the Note as of the date of defeasance.

Cohen testified that sometime in 2007 his accountant told him that the defeasance might be excused because of the threat of condemnation. Affordable later brought this suit against EFA and Fannie Mae, alleging that it was not obligated to pay the defeasance premium because the Jefferson Arms was sold under threat of condemnation and so qualified for the "condemnation award" exceptions to defeasance.[2]

## **Discussion**

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and makes

---

[2] Affordable initially brought claims of negligent misrepresentation, breach of contract, breach of covenant of fair dealing, and unjust enrichment against both defendants. The only claim remaining is the breach of contract claim against Fannie Mae.

inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

*Contract Meaning*

As noted above, the Court of Appeals determined that the parties' agreement "is ambiguous as to whether 'condemnation award' includes a sale in lieu of condemnation." 714 F.3d at 1076. Affordable argues that the Court went on to decide that its interpretation was correct; Fannie Mae points to other provisions of the contract not discussed by the Court of Appeals. I will not at this time discuss in detail the parties' arguments about the various contractual provisions, because I believe there are factual disputes that preclude summary judgment. The Court of Appeals was faced with an appeal from an order granting a motion to dismiss and so looked only to the pleadings and the contract itself. By finding the contract ambiguous, the Court of Appeals necessarily determined that Affordable's construction was plausible. Nothing in its opinion compels a conclusion that Fannie Mae's construction is not also plausible.

Once a court has determined that a contract is ambiguous, the court may consider extrinsic evidence to determine the true intent of the parties. *See State Farm Mut. Auto. Ins. Co. v. Esswein,* 43 S.W.3d 833, 842 (Mo. Ct. App. 2000). Ambiguous terms may be interpreted by examining circumstances evidencing the contracting parties' own interpretations of the contract. *Rosemann v. Roto-Die, Inc.*, 377 F.3d 897, 903 (8th Cir. 2004) (citing *Graham v. Goodman*, 850 S.W.2d 351, 355 (Mo. banc 1993)). "The construction that the parties place upon a contract or an agreement as evidenced by the acts and conduct is strong evidence of the real intention of the parties." *Wilkinson v. Tarwater*, 393 S.W.2d 538, 543 (Mo. 1965). Where the available extrinsic evidence provided on summary judgment does not conclusively show the parties' intent, then summary judgment must be denied and the meaning of the contract is an issue for the trier of fact. *See Protective Life Ins. Co. v. Jim Orr & Assocs., Inc.*, 384 F.3d 949, 951 (8th Cir. 2004).

In addition to arguing that the Eighth Circuit really agreed with its interpretation, Affordable also argues that because the contract was deemed ambiguous, it is entitled to favorable application of the legal principle that an ambiguous contract must be construed against the drafter. *See Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). But this rule is applied as a last resort when extrinsic evidence cannot reveal the parties' intent. *Burrus v. HBE*

*Corp.*, 211 S.W.3d 613, 619 (Mo. Ct. App. 2006) (citing *Graham,* 850 S.W.2d at 356). Here, the extrinsic evidence is disputed, and so issues remain for trial. *See Vandever v. Junior Coll. Dist. of Metro. Kan. City,* 708 S.W.2d 711, 717 (Mo. Ct. App. 1896)("if resolution of the ambiguity requires weighing of the evidence, then the issue is for the jury."). Construction against the drafter would only come into play if, after resolving the factual disputes, the Court still cannot ascertain the parties' intent.[3]

Fannie Mae contends that the drafters intended to restrict the prepayment premium exemption to an actual condemnation, or alternatively, to a conveyance occurring after an entity with eminent domain powers instituted a formal condemnation proceeding. In addition to relying on the contract language, Fannie Mae cites to extrinsic evidence of Affordable's conduct. For example, Affordable notified EFA of the pending sale in December 2005, requested a defeasance analysis, and queried whether EFA had "any concerns about the property being sold under the threat of condemnation." Fannie Mae app. at 231, 233. But Affordable and its counsel never discussed any condemnation issues with EFA. It

---

[3] Affordable makes some references to EFA's presenting the loan terms on a "take-it-or-leave-it basis," but it does not argue that this was an adhesion contract, and it has provided no evidence about the parties' relative bargaining power or the availability of other lenders. *Cf. State ex. Rel. Vincent v. Schneider,* 194 S.W.3d 853, 857 (Mo. banc. 2006)(describing qualities of a contract of adhesion). It is only in such contracts where the court will immediately construe an ambiguous contract against the drafter without first evaluating extrinsic evidence. *See ATC Co., Inc. v. Myatt,* 389 S.W.3d 732, 737 (Mo. Ct. App. 2013).

never notified EFA of any actual condemnation actions or even threats. In 2006, when EFA sent a preliminary cost figure for the defeasance, Cohen was "blown away" by the amount and called EFA to complain. Cohen dep. at 47–49. Affordable's counsel requested that EFA send alternative calculations and argued that any amounts should be lowered to account for the fact that there was an exception for prepayment 90 days before maturity. Fannie Mae app. at 313. Affordable ultimately completed the defeasance process in July 2006. However, it was not until September 2007 that Cohen even began to consider the condemnation award exception to defeasance; he then sought counsel and eventually filed the first lawsuit in 2008. Cohen Dep. at 40–44.

Affordable argues that because Fannie Mae has not presented testimony from EFA witnesses as to their intent about the meaning of the contract, the Court must accept Cohen's testimony as the only explanation. But as noted above, Fannie Mae has pointed to actions taken by Cohen that are not necessarily consistent with what he now claims. This evidence could be viewed by a fact-finder as supporting Fannie Mae's arguments. At the least, it is sufficient to create a genuine issue for trial.

*The Conveyance*

As a second ground for denying summary judgment, Fannie Mae contends that a question of fact exists as to whether Affordable's sale of the Jefferson Arms

- 11 -

actually occurred "in lieu" of condemnation. I agree, and reject Affordable's arguments that these disputes of fact are not material.

As set out in the background section above, when Affordable contracted to sell the Jefferson Arms to Pyramid in 2005, it requested that the contract include a recital that the City of St. Louis had threatened to condemn the Jefferson Arms. It also required Pyramid to obtain a letter addressed to Affordable from the City of St. Louis specifying that the City had threatened condemnation.

Cohen testified that the recital and letter requirement were included in part for tax purposes. He also testified that the only threats he received before he entered into the Pyramid contract were not from the City – rather they were from people who claimed to be able to influence the City. He had no direct communication from the City of St. Louis about any condemnation threat until Pyramid provided him the requested letter, after he signed the Pyramid contract. Cohen Dep. at 133. Cohen saw newspaper articles discussing St. Louis Centre, but he never saw anything in the press mentioning possible condemnation of the Jefferson Arms. Cohen Dep. at 134. Cohen further testified at his deposition that no formal condemnation action had started as of the date of his December 12, 2005, letter to EFA, in which he attached a copy of the Pyramid contract and asked whether EFA had "any concerns" regarding condemnation. Cohen Dep. at 198–199.

Construed in a light most beneficial to Fannie Mae, the non-moving party, *Matsushita*, 475 U.S. at 587, Cohen's deposition testimony and the timing and circumstances of the City's letter could be viewed by a fact-finder as showing that the Jefferson Arms was not under threat of condemnation until after its sale had already commenced, if at all. Because there remain questions of fact precluding Affordable's request for summary judgment, I need not consider at this time its arguments about Fannie Mae's affirmative defense of voluntary payment.

### **Trial Procedures**

The judge who previously handled this case had set it for a non-jury trial with an advisory jury on the three-week docket beginning on January 5, 2015. The parties have filed a joint request for reconsideration of the advisory jury procedure, pointing out that they have waived jury and desire a non-jury trial. I will grant the motion to reconsider and will not use an advisory jury. I am concerned, however, that without a jury to keep them moving, counsel may needlessly prolong the case. With that in mind, the following procedures will apply.

1. The court intends to begin this non-jury trial on **Monday, January 12, 2015 at 9:00 a.m.**

2. No later than **Monday, November 3, 2014**, the parties must file a joint statement informing the court of the expected length of the trial. The parties should include in the estimate of trial length any time they will need to read or play

depositions.  If the parties do not agree on the expected length of the trial, the joint statement must set out each side's position.

3. The final pretrial conference remains set for **Tuesday, December 30, 2014 at 2:00 p.m.**

4. The parties' pretrial submissions are due as follows:

No later than **Monday, December 8, 2014** the parties must:

a. **Stipulation:** File a JOINT stipulation of all uncontested facts.

b. **Witnesses:** Each side must file a list of all its expected witnesses, identifying those witnesses it will call to testify and those it may call.

c. **Stipulated Exhibits:** File a JOINT stipulation of all exhibits that may be received into evidence without objection by either side.

d. **Other Exhibits:** Each side must file an additional list of any exhibits (other than those on the stipulated list), which that party expects to offer into evidence. Plaintiff must use Arabic numerals and defendant must use letters to designate the exhibits. Each side must provide the other (but may not file) copies of all exhibits. For any business records that are not on the stipulated list, the proponent must indicate whether the proponent seeks to authenticate the business record by affidavit or declaration pursuant to Fed. R. Evid. 902(11) or 902(12). Any objections to exhibits must be filed no later than **Friday, December 19, 2014.**

e. **Depositions, Interrogatory Answers, and Request for Admissions:** File a list of all interrogatory answers or parts thereof and depositions or parts thereof (identified by page and line numbers), and answers to requests for admissions proposed to be offered in evidence. The opposing party must file any objections and any additional portions of such depositions required for completeness no later than **Friday, December 19, 2014.**

f. **Proposed Findings of Fact and Conclusions of Law:** Each party must file proposed findings of fact and conclusions of law, including citations to relevant authority, that the party believes should be issued by the Court. No additional trial briefs may be filed.

g. **Motions In Limine:** File all motions in limine to exclude evidence no later than **Friday, December 19, 2014.** Written responses to motions in limine are not required, but if a party chooses to respond in writing any response must be filed no later than **Tuesday, December 23, 2014.**

Any evidence not listed in compliance with this order will not be received; any objections not raised in compliance with this order will be deemed waived.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment [# 130] is denied.

**IT IS FURTHER ORDERED** that the parties' joint motion for reconsideration [#160] is granted to the extent set out above.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of October, 2014.